[Crim. No. 10267. In Bank. May 23, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE GLENN MODESTO, Defendant and Appellant.

Russell E. Parsons, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—For the third time, a jury has found defendant guilty of the first degree murders of Connie and Mary Mack and has fixed the penalty at death.[1] This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The record before us suggests seven possible bases for reversing the judgment below. After careful examination, we find them all to be without merit.

We examine here the contentions (1) that the trial court should have granted defendant's motion for a change of venue; (2) that defendant's statements to the police should

---

[1] The judgment in the first trial was reversed on the ground that the trial court erred in refusing to instruct the jury on the issue of manslaughter. (*People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal. Rptr. 225, 382 P.2d 33].) Upon retrial, the jury found defendant guilty of two counts of first degree murder, determined that he was sane at the time each crime was committed, and again fixed the penalty on each count at death. The judgment in the second trial was reversed on the ground that the conviction rested in part upon statements obtained from the defendant in violation of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]. (*People* v. *Modesto* (1965) 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753].)

The case was set for retrial, and on November 12, 1965, the trial court denied without prejudice defendant's motion for a change of venue. The jury was impanelled on February 10, 1966. On February 14, defendant entered pleas of not guilty and not guilty by reason of insanity; on March 11, the jury found defendant guilty as charged. On March 16, the court granted defendant's motion to withdraw his insanity plea. The next day, after proceedings on the issue of penalty, the court pronounced judgment in accordance with the jury's determination that defendant should suffer the penalty of death for each of the two murders.

In the present trial, the court gave the requested manslaughter instructions, thereby complying with the law of this case as established by *People* v. *Modesto, supra,* 59 Cal.2d 722; the prosecution made no attempt to reintroduce the statements which were held inadmissible in *People* v. *Modesto, supra,* 62 Cal.2d 436.

have been excluded; (3) that the evidence adduced by the prosecution failed to support a conviction of first degree murder; (4) that the trial court erroneously limited defense counsel's closing argument; (5) that the prosecution improperly suggested that, if the defendant were found not guilty by reason of insanity, he would be "set free" rather than confined in a mental institution; (6) that the prosecution erroneously commented upon the defendant's failure to take the stand; and (7) that the prosecutor's improper references to the defendant's first two trials infected both the guilt trial and the penalty trial with reversible error. Preliminarily, we summarize the evidence introduced at defendant's trial.

### Guilt Phase

At approximately 10 p.m. on October 28, 1961, Mr. and Mrs. Ardel Mack left their two daughters in bed and went to a bar where Mr. Mack worked as a guitarist in a dance band. Upon returning home around 2 a.m., the Macks found their nine-year-old daughter, Mary, lying on the floor. A trail of blood near her dead body indicated that she had been dragged a short distance after her face and head had been badly beaten.

Mary's sister, Connie, who was to have celebrated her thirteenth birthday several days later, had disappeared. The brassiere which she usually wore to bed was lying on top of her blankets and sheets on the bedroom floor; the brassiere, the blankets, and the sheets were stained with blood, as were Connie's mattress and pillow. Her underpants were similarly bloodstained; although she had apparently put them on before going to bed on October 28, they were later discovered stuffed next to a toy in a box at the foot of Mary's bed.

Suspicion immediately focused upon the defendant, a family friend who had spent most of the preceding day drinking beer with Mr. Mack. During the afternoon of October 28, the two men picked up Connie to drive her home; she refused to ride in the front seat next to the defendant until her father insisted that she do so. After taking Connie home, the men drove around town and continued their drinking. Later that evening the defendant saw Mr. Mack at the bar; around 10:30 p.m. the defendant left after a misunderstanding with Mr. Mack over who was to pay for some drinks; he knew the Macks did not plan to return home until 2 a.m.

The defendant was arrested at his home at approximately 2:30 a.m., October 29, 1961. Asleep in his bed, he was wearing only a bloodstained pair of shorts. His hands, as well as the

clothes strewn about the floor of his room, were stained with blood, as were the right rear fender, the right rear door handle, the floor mat, and the rear seat of his car. The blood on the seat appeared to have been smeared by a body moving in many directions. Semen stains marked defendant's T-shirt, the outside of his trousers, and the shorts he was wearing. Officers removed a sledgehammer with a four-pound head from the trunk of defendant's car; chemical analysis disclosed that the hammer had been heavily smeared with blood but had been washed.

Police began to question defendant around 6 a.m., after an intensive search for Connie's body had begun. Officers suggested to the defendant that Connie might still be alive and that, if he could help them locate her, they might be able to save her life. Defendant did not respond immediately, but after a few minutes of silence he said ''Water.'' Several minutes later he added, ''Avenue 62 and the storm drain.'' Officer Mabbitt immediately telephoned Captain Brooks and suggested that the search be extended to include the area indicated by the defendant's remarks.

Approximately two hours later, several officers took the defendant to the storm drain; he showed them where Connie had fallen in. An attorney contacted by the defendant's family then arrived to represent him; he and the defendant conferred privately in a police car and then joined in the search. As the defendant walked along the bank of the storm drain together with his attorney and three police officers, he said that he had parked his automobile at the drain and had dragged Connie's body from his car to the culvert in order to wash some blood off her face; he said that she had somehow slipped into the water through a corrugated metal pipe, that he could not see her but could hear her moans, and that he had searched for her without success before going home to bed.

Soon after the defendant had made these statements, the officers learned that Connie's body had been discovered moments earlier in the drainage ditch downstream from the point at which defendant said she had fallen into the water. She was naked below the waist; four parallel scratches about two inches in length were visible high on the outside portion of her right thigh, and five similar scratches could be seen on the corresponding area of her left hip. A pathologist testified that the scratches could have been caused by human fingernails; defendant's fingernails were caked with blood at the

time of his arrest. Although Connie's hymen had apparently been ruptured, the pathologist could not state whether or not she had been sexually molested since her body had remained in rapidly moving water for over nine hours.

Autopsies showed that both girls had been severely beaten with a heavy metallic object sometime around midnight. Mary's death resulted from brain injuries caused by multiple skull fractures. Although the immediate cause of Connie's death was drowning, the injuries to her head would likewise have proved fatal. Many of the injuries to each girl's head could have been inflicted by defendant's sledgehammer.

The defendant's wife admitted that her husband had driven away from home shortly before midnight and had returned some time thereafter covered with blood; he had attempted to account for the blood by referring to a "fight" with an unidentified man. The defendant's wife testified that she later discovered that no such fight had occurred.

The prosecution sought to prove that the killings were murders of the first degree (Pen. Code, § 189) on the ground that they were either wilful, deliberate, and premeditated, or were perpetrated during the commission or attempted commission of burglary, rape, or an act of child-molesting punishable under Penal Code section 288. Defendant did not testify.

The central theory of the defense was that the defendant, far from killing either of the Mack sisters, had in fact tried to save Connie's life. Defense counsel argued that the defendant, his mind clouded from alcohol, inexplicably decided shortly before midnight to drive from his home to the Mack residence in order to "check up" on the two girls; that, upon arriving at his destination, he saw Connie lying wounded on the lawn in front of the house; that he put her into his car with the intention of driving her to a nearby doctor; that he suddenly decided to stop at the storm drain to wash some blood from Connie's face; that he dragged her body across the road for that purpose; and that, shortly thereafter, she somehow slipped into the water. According to this theory, the defendant tried in vain to find her before she drowned but soon gave up and returned home covered with Connie's blood.

Defendant's theory, which rested entirely upon unfounded speculation, could hardly be successfully reconciled with his failure to alert anyone, including his wife, to the fact that Connie might still be alive; the theory suggested no possible

answer to the key question of who, if not the defendant, had attacked the Mack sisters; it did not account for defendant's attempted exculpatory statement to his wife; it left unexplained the presence of semen stains on his clothing; and it could not account for the blood on his shorts, the blood smeared over the rear seat of his car, the blood which encrusted his fingernails, or the blood which had been washed from his sledgehammer.

Recognizing the weakness of his primary line of defense, counsel for defendant sought to establish that the defendant was so intoxicated at the time of the killings that, even if he had been the assailant, he could not have formed the requisite intent to kill or to commit any of the felonies enumerated by the prosecution. The evidence adduced by the defense in this connection consisted largely of testimony that the defendant had consumed a substantial quantity of beer before midnight and that he appeared somewhat drunk to several people who had observed his behavior that evening. Based upon tests showing that the defendant's blood alcohol level at 3:30 a.m was approximately .15 percent, a medical expert testified that, assuming the defendant had consumed no alcohol after 11:30 p.m., his blood alcohol level at the time the girls were killed could have been as high as .20 percent; the expert testified that in the average individual this level of alcohol would markedly impair muscular coordination, visual acuity, and judgment. The prosecution's evidence in this regard convincingly demonstrated that, although the defendant had been drinking, he remained in full control of his faculties throughout the night and morning. There was no evidence demonstrating that the defendant's intoxication, such as it was, in any way impaired his ability to formulate a plan of action or to comprehend its significance.

Not surprisingly, the jury rejected both theories advanced by the defense and returned verdicts finding the defendant guilty of two counts of first degree murder.

### Penalty Phase

During the penalty phase of defendant's trial, the prosecution introduced evidence of nine prior convictions, including one for grand theft (Pen. Code, § 484), two for burglary (Pen. Code, § 459), and one for second degree murder (Pen. Code, § 187).

The prosecution also called three women to the witness stand. The first, Miss Medina, testified that in September 1961

the defendant raped her and threatened to kill her if she went to the police; the second, Mrs. Barnett, testified that in December 1960 the defendant threatened to harm her two-year-old son unless she would go for a "ride" with him; the third, Mrs. Kelley, testified to the details of the second degree murder for which defendant had been imprisoned in 1955. Mrs. Kelley had been a witness to that murder; she said that the killing followed the victim's refusal to purchase whiskey for the defendant. After the defendant had virtually decapitated his victim, he told Mrs. Kelley that "he got a thrill out of killing. He enjoyed it very much." Mrs. Kelley testified further that the defendant then boasted of having killed four others and threatened to make her his next victim because he "couldn't leave a witness."

The prosecution relied upon the testimony of Miss Medina and Mrs. Barnett to strengthen its argument that the defendant probably entered the Mack home with the intent to gratify a sexual urge with Connie Mack; the testimony of Mrs. Kelley was employed to support the prosecution's position that the defendant probably killed Mary Mack because she had witnessed whatever he did to Connie. The defense presented no evidence to counter the case thus constructed by the prosecution; the jury fixed the penalty at death.

### Pretrial Publicity

■ Before reaching the alleged errors in the trial itself, we discuss defendant's threshold contention that the trial court should have granted his motion for a change of venue on the ground that he could not obtain a fair trial in Riverside County. (Pen. Code, § 1033.) Defendant supported his motion with exhibits illustrating the inflammatory newspaper coverage of his first two trials and this court's reversals of the judgments therein. He argued that, as a result of such publicity, prospective jurors must have known of his extensive criminal record, including the fact that at the time of the homicides in the instant case he was on parole from a judgment of conviction of second degree murder; that he had confessed to killing the two victims in this case and had previously been sentenced to death for having murdered them; that he had told police he thought "he had intercourse with one of them"; and that the judge at the first trial had indicated his agreement with the jury's conclusion.

The newspaper articles supporting defendant's motion spanned a period of over a decade. The first dealt with defendant's second degree murder trial and was published on

April 29, 1955; the last, published on May 18, 1965, discussed the rule prohibiting comment on a defendant's silence (*Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]) and its possible impact upon defendant's forthcoming retrial. The trial court denied the motion without prejudice on November 12, 1965. During *voir dire* proceedings, the court properly admonished all prospective jurors to refrain from reading about the case or listening to any news broadcast which might mention it.

Defendant points to no evidence indicating that any specific person finally selected to serve as a juror was in fact influenced adversely by articles or reports in the newspapers or other media; he argues only that the *possibility* of a prejudiced jury was so pervasive that the trial court abused its discretion in denying the pretrial motion to change venue. On appeal from the conviction obtained in defendant's second trial, we rejected precisely this contention. (*People* v. *Modesto, supra,* 62 Cal.2d at pp. 442-443.) Although we can no longer say, as we could after defendant's second trial, that "no difficulty was experienced in securing jurors who were not aware of the earlier publicity" (*id.,* at p. 443), we find no significance in the fact that several of the jurors ultimately selected recalled having read accounts of the crime or of defendant's previous encounters with the courts, since the defense accepted such jurors in the final panel without exhausting its peremptory challenges and without renewing its motion to change venue. ▮ In every significant respect, therefore, the facts pertinent to defendant's argument are the same now as they were when we rejected that argument on defendant's previous appeal. Our disposition of defendant's identical contention after his second trial, pursuant to the doctrine of the law of the case, thus forecloses relitigating the issue at this time. (See *People* v. *Terry* (1964) 61 Cal.2d 137, 151 [37 Cal.Rptr. 605, 390 P.2d 381]; cf. *People* v. *Hillery* (1967) 65 Cal.2d 795, 803 [56 Cal.Rptr. 280, 423 P.2d 208].)[2]

---

[2]Although the doctrine would not apply if an intervening decision had altered or clarified the applicable legal principles (*People* v. *Terry, supra,* 61 Cal.2d at p. 151 fn. 9), no such alteration occurred here. The recent cases of *Estes* v. *Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628], and *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], do not affect the ruling here. In both cases, disruptive activities in the courtroom were held to have prevented the calm and concentration which due process demands. While the *Sheppard*

## *Introduction of the Defendant's Statements to the Police*

The doctrine of the law of the case similarly defeats the defendant's present effort to challenge the admissibility of the statements he made before Connie's body was discovered at a time when the officers were concerned primarily with the possibility of rescuing her. We recognized on defendant's previous appeal that this issue would arise on retrial; we held that the "paramount interest in saving her life, if possible, clearly justified the officers in not impeding their rescue efforts by informing defendant of his rights to remain silent and to the assistance of counsel. Since these statements were voluntarily made and lawfully obtained, there is no basis for their exclusion." (*People* v. *Modesto, supra,* 62 Cal.2d 436, 446; see also *People* v. *Jacobson, supra,* 63 Cal.2d 319, 328.)

The evidence presented on retrial amply supported the factual conclusion of the trial judge that in questioning the defendant the police were concerned primarily with locating the missing girl.[3] The trial court properly recognized that, since the facts on which we predicated our prior ruling remained unchanged, that ruling precluded holding the defendant's statements inadmissible. No intervening decision had altered the applicable rule of law;[4] that rule therefore remained, as the trial judge put it, "the law of not only the State, but of this case."

---

court discussed pretrial publicity at length, it explicitly declined to hold that such publicity in itself worked a denial of due process. (See 384 U.S. at p. 354, 16 L.Ed.2d at p. 616.) (See also *People* v. *Jacobson* (1965) 63 Cal.2d 319, 325 [46 Cal.Rptr. 515, 405 P.2d 555].) Thus the governing rule still requires the accused, under circumstances such as these, to show prejudice in order to prevail; no such showing has been attempted here.

[3]Defendant notes that the officers who questioned him did not take him to the storm drain until approximately two hours after he told them where Connie might be found. He adds that no medical assistance was called to the area mentioned in his statement to police. The record demonstrates, however, that the search for Connie's body was immediately extended to the area indicated by the defendant, and that adequate medical facilities were available nearby. The evidence stressed by defendant provides no basis for questioning the trial court's finding that the dominant objective of the challenged interrogation was the rescue of Connie Mack.

[4]We note that *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], has no bearing on the instant case since the present retrial began in February 1966 and the principles announced in *Miranda* do not govern pre-*Miranda* trials in this state. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

## Sufficiency of the Evidence

■ Defendant urges that the evidence was insufficient to support the jury's conclusion that he acted with deliberation and premeditation.[5] We cannot accept any such view of the record before us. The circumstances surrounding the murder of the two girls, including the events of the preceding afternoon and the nature of their injuries, amply supported a determination that their assailant had entered the Mack home at a time when he knew the girls would be alone, fully intending to commit rape or an act punishable under Penal Code section 288, and that the killings themselves were neither accidental nor even purely impulsive.[6]

The jury was properly permitted to consider evidence of defendant's alleged intoxication in deciding upon his mental state at the time of the killings. Given the weakness of that evidence, the jury was certainly justified in rejecting the view that defendant had acted in a drunken stupor and that he had committed only manslaughter or second degree murder.

### Limitation of Defense Counsel's Closing Argument

Defendant urges that the trial court should have permitted defense counsel to present his theory of the case to the jury. This contention lacks substance.

The trial court permitted defense counsel to argue that defendant stopped his car before reaching the Mack residence; that, as defendant walked across the front yard, his foot might have come into contact with Connie's wounded body; and that he might have been driving her to a doctor before he stopped at the storm drain.

■ The trial court did *not*, however, permit the defense to suggest to the jury that, as defendant stopped his car, he saw a mysterious assailant attacking Connie in front of her house; that he took the sledgehammer from his trunk in order to fight off the intruder; and that the culprit fled before the defendant could reach the scene of the attack. If the record

[5]There is of course no question of the sufficiency of the evidence to identify the defendant as the assailant.

[6]No evidence was presented to suggest that the defendant suffered from any impairment, either permanent or temporary, in his ability to reflect upon the gravity of his contemplated act (cf. *People* v. *Nicolaus* (1967) 65 Cal.2d 866 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke* (1967) 65 Cal. 850 [56 Cal.Rptr. 625, 423 P.2d 777]) or in his ability to comprehend the duty to conform his conduct to the commands of society (cf. *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].)

contained any evidence whatever tending to support such a theory of what transpired, we would of course conclude that the trial court committed gravely prejudicial error in depriving defendant of the opportunity to present that theory to the jury.

A careful examination of the entire record, however, reveals no evidence which might furnish support for the hypothetical argument constructed by defendant's attorney.[7] In ruling the argument improper, the trial judge was simply carrying out his duty to "control all proceedings during the trial, and to limit . . . the argument of counsel to relevant and material matters" (Pen. Code, § 1044) by confining counsel's factual argument to the record.

■ Defendant correctly states that his failure to take the stand should not be held to prevent his attorney from drawing all inferences fairly supportable by evidence appearing in the record; we hold only that defendant's failure to take the stand does not entitle his attorney to engage in purely speculative argument, substituting his own testimony for that of the defendant in order to insulate the theory of the defense from the scrutiny of cross-examination.

*Prosecution's Discussion of*
*the Insanity Defense*

■ We now consider the contention that the prosecutor's comments concerning the insanity defense require reversal of the judgment below; we explain our conclusion that the comments were clearly improper but that, under the special circumstances of this case, they proved to be nonprejudicial.

Several times during the selection of the final jury panel, the prosecution alluded to defendant's plea of not guilty by reason of insanity and stated that, if the defendant were found insane at the time he committed the offense, he would be "turned loose." That statement constituted obvious misconduct, not only because it misstated the law[8] but also because it urged the jury to usurp functions reposed by statute in other hands.[9] (See *People* v. *Sorenson* (1964) 231

---

[7]As the trial judge correctly observed, there was "no testimony tending to indicate that the Defendant . . . observed *anything* in the yard or on the road." (Italics added.)

[8]Penal Code sections 1026 and 1026a provide that a defendant acquitted on grounds of insanity must be confined in an appropriate institution, not to be released without a judicial hearing and a finding of restoration to sanity.

[9]Compare *People* v. *Morse* (1964) 60 Cal.2d 631, 644 [36 Cal.Rptr. 201, 388 P.2d 33].

Cal.App.2d 88, 91-92 [41 Cal.Rptr. 657], and cases there cited.)

If such misconduct had occurred in the course of a trial on the issue of insanity, it would have worked incalculable harm by planting in the minds of the jurors the inflammatory suggestion that if they returned a verdict of insanity ''they would turn loose upon the community a dangerous person capable of doing much mischief.'' (*People* v. *Mallette* (1940) 39 Cal.App.2d 294, 299-300 [102 P.2d 1084].) In the present case, however, the error occurred at the commencement of the trial on the issue of guilt, and defendant subsequently withdrew his plea of not guilty by reason of insanity. Even if we were to accept the view that the prosecutor's misconduct appealed to a sentiment too deeply rooted to be erased by an instruction as to the true effect of an acquittal on grounds of insanity (see *People* v. *Mallette, supra,* 39 Cal.App.2d at p. 300), we could not hold that such misconduct constituted reversible error here, since the defendant rendered the matter moot by waiving the right to a sanity trial.

### Comment on the Defendant's Failure to Testify

We turn to the contention that prosecutorial comment upon the defendant's silence infected the present trial with reversible error; we examine the prosecution's comments and conclude that, although they were improper, their presence does not require a new trial under the federal test of harmless constitutional error.

The trial presented the jury with many occasions on which to dwell upon defendant's conspicuous absence from the witness stand.[10] Defendant's attorney did not suggest that the blood found on defendant's person, on his clothing, and in his car, could have come from anyone other than the two dead girls. Indeed, he ultimately conceded that one of the girls, Connie, had been in the defendant's car; that the defendant had driven her to the storm drain; and that he had dragged her across the road to the place where her body slid into the water. Defense counsel presented evidence of intoxication but did not argue that defendant was unconscious at any time during the night of the killings; he suggested no reason to believe that the defendant could not recall how Connie had come to be in his car or what had transpired

---

[10]On *voir dire,* counsel for the prosecution had told most if not all of the prospective jurors that, although the defendant could not be compelled to testify, he could choose to do so at any time.

there. Given this posture of the defense, defendant's silence inevitably assumed great significance to the jury.

■ [See fn. 11] In his closing argument, the prosecutor repeatedly exploited this weakness in the defendant's case; on several occasions he came dangerously close to commenting upon the defendant's failure to take the stand, in violation of the rule announced almost a year before the present trial, in *Griffin* v. *California, supra,* 380 U.S. 609.[11] ■ One comment by counsel for the prosecution not only came close to the *Griffin* line but crossed it. Discussing the fact that Connie's underpants had been found in a box near Mary's bed, the prosecutor argued: "Now, obviously . . . after she had been hit with that hammer, little Connie didn't walk over

---

[11]Implying that the defendant might have attacked Connie sexually in his car before dragging her body to the canal, the prosecutor noted that the blood on the back seat "was smeared from some type of action. What action? I don't know, because Connie isn't here to tell you . . . ." Addressing himself to defense counsel's theory that the defendant might have seen Connie injured and bleeding in front of the Mack home and might have been trying to drive her to a nearby doctor when he stopped to wash the blood off her face just before she slipped into the canal, the prosecutor correctly observed that this theory was riddled with fatal defects and properly noted that no evidence in the record supported any such version of what had occurred. On several occasions, the prosecutor added: *"Who is testifying . . . that this was done or that this was what Mr. Modesto was doing? . . . Who testified to this? . . . This is* [*Modesto's Lawyer*] *testifying."* (Italics added.) He commented further that only the defendant's *attorney* "testified" that the defendant did not enter the Mack home on the night of the murder. Noting that defense counsel had attempted to establish not only that defendant did not kill the Mack sisters but also that whatever happened to the two girls that night did not amount to first degree murder, the prosecutor expressed curiosity as to precisely what the defendant expected the jury to believe. "Is it . . .: 'Well, ladies and gentlemen, . . . I didn't do it. I wasn't in there . . .' [or is it: 'If] you believe I was, now then I didn't rape her' [or; 'If you believe I did, I didn't mean to . . . .' "

In summation after the penalty phase of defendant's trial, the prosecution again noted that only defense counsel "testified." Referring to defendant's 1955 murder trial, the prosecution said: "This is what happened to Mr. Laraize [the victim of the 1955 murder]. This is the man that shows remorse, that he would go back and rob a corpse. Then where did he go? *I don't know what he told that Jury, if he told them anything.* What does he do? He goes down to another bar with this . . . Mrs. Kelley . . . ." (Italics added.)

We cannot approve these repeated references to the fact that only the defendant's *attorney* had attempted to offer any "testimony" to explain the incriminating evidence adduced by the prosecution, nor can we countenance the prosecution's remarks about the 1955 trial, or his method of couching hypothetical defenses in the form of testimony which the defendant might have given if he had chosen to take the stand on his own behalf. Although these statements did not, strictly speaking, amount to comments upon the defendant's failure to testify, we observe here that they bordered upon conduct held constitutionally impermissible in *Griffin.* We trust that such statements will not be repeated in future trials.

there and put those pants in that box. . . . *How they got over there I can't tell you, because I wasn't there. Neither was [defendant's attorney]."* (Italics added.) "[T]hese little girls . . . ddin't take [the pants] over there. But, whoever did had blood on [him], because there is [a pool of] blood . . . right down there where the box is . . . . *So, somebody had blood on [him] who took them over there. Who had blood on him? Who is the only person around who had blood on him, besides the two little girls? You know who he is. He is sitting here in this courtroom—and just sitting."* (Italics added.)

Although the comment now before us leaves more to the jury's imagination than did the remarks which the *Griffin* court held unconstitutional,[12] we cannot ignore the transparent implications of the words chosen by counsel for the prosecution in the instant case. The rulings of the courts should not be so esoteric that a judgment must turn on the superficial difference between this prosecutor's phraseology and that found improper in *Griffin*.

To borrow a phrase from another context, the comment condemned in *Griffin* is not "a magical incantation, the slightest deviation from which will break the spell." (*Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 418 [17 L.Ed.2d 456, 484, 87 S.Ct. 534] (Fortas, J., dissenting].) As a "simple, rugged communication . . . to a jury of ordinary people," it is "entitled to be appraised in terms of its net effect." (*Ibid.*) Viewed from this perspective, the comment disclosed by the record before us must be deemed violative of the constitutional doctrine enunciated in the *Griffin* decision.

 But this is only the beginning, not the end, of our inquiry, for the United States Supreme Court has recently held that the prohibition against comment upon a defendant's failure to take the stand is not "so basic to a fair trial that [its] infraction can never be treated as harmless error [footnote omitted]" (*Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824]). The *Chapman* court reasoned that some departures from the *Griffin* rule, like certain defects in the formalities of trial procedure, may on

---

[12]The comment disapproved in *Griffin* was somewhat more explicit than the one presented here; the prosecutor there said: "These things [the defendant] has not seen fit to take the stand and deny or explain. And in the whole world, if anybody would know, this defendant would know. [The victim] is dead, she can't tell you her side of the story. The defendant won't." (380 U.S. at p. 611, 14 L.Ed.2d at p. 108.)

occasion fail completely to touch the merits of a verdict. The prosecution bears the burden of demonstrating that a particular *Griffin* violation proved entirely inconsequential; once such a showing has been made, however, the violation no longer serves as a basis for reversal. We must therefore decide, in accordance with the *Chapman* test of harmless constitutional error, whether the prosecution has proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824].)

We note at the outset that, unlike *Chapman*, this case is clearly *not* one "in which, absent the constitutionally forbidden comments, honest, fair-minded jurors might very well have brought in not-guilty verdicts." (*Id.,* at pp. 25-26, 17 L.Ed.2d at p. 711.) Given the overwhelming evidence that defendant committed first degree murder, including defendant's highly incriminating statements to the police and his attempted exculpatory statements to his wife, we think it most unlikely that any jury would have reached a different conclusion even if the prohibited comment had not been articulated. The *Chapman* rule, however, requires us to look further. We cannot affirm the instant conviction simply because we deem it improbable that a result more favorable to the defendant would have been reached in the absence of the *Griffin* error; that formula was, after all, the precise test which *Chapman* held impermissible.

At the same time, we need not reverse this conviction for the sole reason that we *might* be able to conceive of *some possibility,* however remote, that a jury *could* have been marginally influenced by the comment in question. The *Chapman* test is couched in terms of "reasonable doubt" and, as the courts tell every juror who sits in judgment in a criminal case, a reasonable doubt must be more than a "possible" doubt, since complete certainty is unattainable in the affairs of men. Upon an examination of the entire record, we can conceive of no *reasonable* possibility that the error might have materially influenced any juror in arriving at the verdict in this case.

In reaching this conclusion, we must distinguish the impact of the defendant's *silence* from the impact of the prosecutor's *comment* upon that silence; if we were concerned with the former rather than the latter, we could not disregard the devastating effect in the present case of the defendant's fail-

ure to take the stand. But, as the court said in *Griffin,* "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." (380 U.S. at p. 614 [14 L.Ed.2d at p. 110].)

 We recognize that "the Fifth Amendment . . . forbids" not only all "instructions by the court that [the accused's] silence is evidence of guilt" but also any "comment by the prosecution on the accused's silence." (380 U.S. at p. 615 [14 L.Ed.2d at p. 110].) Nonetheless, in assessing the possibility that a particular comment contributed to a conviction we must focus upon *the extent to which the comment itself might have increased the jury's inclination to treat the defendant's silence as an indication of his guilt.* The risk that a comment will have this effect may become considerable if either the court[13] or the prosecution[14] "solemnizes the silence of the accused into evidence against him" (380 U.S. at p. 614 [14 L.Ed.2d at p. 110]) by telling the jury "that from the failure of [the defendant] to testify . . . the inferences from the facts in evidence [should] be drawn in favor of the State" (386 U.S. at p. 25 [17 L.Ed.2d at p. 711]). A forbidden comment, however, is less likely to affect the "substantial rights" of a defendant (386 U.S. at p. 23 [17 L.Ed.2d at p. 710]) if that comment merely *notes* the defendant's silence and includes no suggestion that, among the various inferences which might be drawn therefrom, those unfavorable to the defendant are the more probable. As the court pointed out in *Griffin,* absent such a suggestion "the inference of guilt is not always so natural or irresistible." (380 U.S. at pp. 614-615 [14 L.Ed.2d at p. 110]; cf. *Bruno* v. *United States* (1939) 308 U.S. 287, 294 [84 L.Ed. 257, 261, 60 S.Ct. 198].) We do not mean to imply that a prohibited comment is necessarily or even ordinarily harmless so long as it is unaccompanied by a statement that silence implies guilt; we simply note that the absence of any such statement tends to mitigate the independently damaging effect of a comment uttered in violation of the *Griffin* rule.

 The comment involved in the present case included no suggestion that an inference of guilt might be drawn from the defendant's silence; the court rendered no instruction on

[13]See, e.g., *Griffin* v. *California, supra,* 380 U.S. at page 610 [14 L.Ed. 2d at page 107].

[14]See, e.g., the appendix to the court's opinion in *Chapman* v. *California, supra,* 386 U.S. at pages 26-42 [17 L.Ed.2d at pages 712-720].

the subject;[15] nor was the comment itself either explicit or extensive. Thus we do not deal here with what the *Chapman* court characterized as "a machine-gun repetition of a denial of constitutional rights, all designed and calculated to make [defendant's] version of the evidence worthless. . . ." (386 U.S. at p. 26 [17 L.Ed.2d at p. 711].)

Moreover, in contrast to the compelling and largely unchallenged evidence presented by the prosecution, the defense here relied entirely upon two theories, one of which was inherently implausible and the other of which turned upon evidence of defendant's intoxication, a subject which the challenged comment in no way touched. In order to prove prejudicial, a comment which could not serve to fill an evidentiary gap in the prosecution's case must at least touch a live nerve in the defense, not one which has been rendered inert by such intrinsic improbability as would prevent it from generating any real doubt in the mind of a reasoning juror. Thus the posture of the defense in the instant case minimized to the point of insignificance the possible impact of the comment. Although we cannot dismiss that comment as an inadvertent and irrelevant breach in trial etiquette, we are convinced beyond a reasonable doubt that its presence at defendant's trial contributed neither to his conviction of first degree murder nor to the imposition of the death penalty.

### Improper References to Prior Trials

We consider finally the persistent efforts of the prosecutor to impress upon the jury the fact that he was personally convinced of the defendant's guilt and that he had already persuaded two previous juries and two other trial judges that the defendant deserved to die. ▆▆▆ [See fn. 16] Seizing upon defense counsel's charge that the prosecutor and two prior juries, blinded by the enormity of the offense, had overlooked glaring defects in the case against the defendant,[16]

---

[15]The *Griffin* court expressly declined to decide (see 380 U.S. at p. 615 fn. 6 [14 L.Ed.2d at p. 110]) whether the defendant may *require* the court to charge the jury that his silence must be disregarded. (See *Bruno* v. *United States, supra,* 308 U.S. 287.)

[16]If these remarks exceeded the limits of proper defense argument, the appropriate remedy for the prosecution would have been "to call [such error] to the attention of the court and have it stopped." (*People* v. *Kramer* (1897) 117 Cal. 647, 650 [49 P. 842].) The prosecutor in this case, however, permitted defense counsel to characterize the People's case as groundless and misguided. Having allowed such comments to go uncorrected, the prosecution may not rely upon them to justify retaliatory remarks of its own. (*People* v. *Kirkes* (1952) 39 Cal.2d 719, 725-726 [249 P.2d 1].)

counsel for the prosecution repeatedly declared that he would never prosecute a man whom he did not believe to be guilty.

■ We have recognized that such a declaration is tantamount to a testimonial assertion that the prosecutor believed the defendant guilty from the very inception of the prosecution; we have condemned any such assertion since it implies that the prosecution possesses proof of guilt beyond that which the jury has examined. (*People* v. *Kirkes, supra,* 39 Cal.2d 719, 723-724 [249 P.2d 1].) That implication was seriously compounded in the present case when the prosecutor stated that 24 other jurors and 2 other trial judges had accepted his theory of the crime; that the facts presented to those judges and jurors, rather than his own eloquence as a prosecutor, had convinced them that the defendant "belongs . . . in the gas chamber"; and that the judges presiding at defendant's three trials would surely have prevented him from attempting to send an innocent man to his death.

In thus invoking the beliefs of other judges and juries, predicated upon evidence with which defendant was not confronted at the instant trial, counsel for the prosecution clearly overstepped the bounds of permissible argument. Whatever the guilt of the defendant, he is surely entitled to a trial uninfected by hearsay references to conclusions which others have reached[17] on the basis of unspecified evidence,

---

[17]Insofar as the prior verdicts, and the rulings of the former trial judges in refusing to grant new trials or to reduce the penalty to life imprisonment, were employed to suggest that 24 jurors and 2 judges believed that the defendant was guilty and deserved the death penalty, those verdicts and rulings constituted the testimonial assertions of persons whom defendant obviously had no opportunity to question. Twenty-four jurors and two judges were thereby enlisted as highly persuasive witnesses for the prosecution, witnesses whom the defendant could neither confront nor cross-examine. Such a violation of the confrontation clause of the Sixth Amendment (*Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]) might constitute reversible error even when it is perpetrated with the complicity of defendant's own attorney, for if the defendant "'himself did not intelligently and knowingly agree to be tried in a proceeding . . . in which he would not have the right to be confronted with and cross-examine the witnesses against him,'' his right to confrontation "cannot be waived by his counsel . . . .'' (*Brookhart* v. *Janis* (1966) 384 U.S. 1, 7 [16 L.Ed.2d 314, 318-319, 86 S.Ct. 1245].)

The present case, however, differs from *Brookhart* in that most of the prosecution's witnesses in this case testified at the instant trial. Defense counsel, having questioned these witnesses and having countered the People's case in chief, referred to the prior verdicts in argument and made no objection when the prosecution employed those verdicts in a testimonial capacity. Just as defense counsel may forego the right to cross-examine a specific witness without first consulting the defendant (*Brookhart* v. *Janis, supra,* 384 U.S. 1, 8 [16 L.Ed.2d 314, 319, 86 S.Ct.

much of which has subsequently been ruled improper,[18] and none of which defendant could effectively challenge in the present trial.[19]

Although defense counsel unfortunately initiated this damaging discussion of the previous verdicts, the prosecution's comments went further than those of the defense insofar as they referred to the reasoning supposedly underlying the first two verdicts and invited the jury in the present case to do no "less than what two of [its] predecessors did."

We nonetheless conclude that the remarks improperly added by the prosecution do not entitle the defendant to a new trial. Having embarked upon his own analysis of the former trials in this case, defense counsel neither objected to the prosecutor's rebuttal comments nor requested that the jury be told to disregard them. Although some comments by a prosecutor may place the defense at a disadvantage which no admonition by the trial judge can effectively cure before irreparable harm results (see, e.g., *People* v. *Alverson* (1964) 60 Cal.2d 803, 808 [36 Cal.Rptr. 479, 388 P.2d 711]; cf. *People* v. *Bandhauer, ante,* p. 524 [58 Cal.Rptr. 332, 426 P.2d 900]), the remarks challenged in this case were not of that character. (Cf. *People* v. *Perry* (1939) 14 Cal.2d 387, 396 [94 P.2d 559, 124 A.L.R. 1123].)

Here, as in *Bandhauer,* the objectionable statements entered the prosecutor's argument gradually; but in this case, unlike *Bandhauer,* a timely objection by the defense would have

_____

1245] (Harlan, J., concurring)), so too the tactical decision reflected by the conduct of the defense in the present case may bind the accused. (See *Henry* v. *Mississippi* (1965) 379 U.S. 443, 451 [13 L.Ed.2d 408, 415, 85 S.Ct. 564]; cf. *Brookhart* v. *Janis, supra,* 384 U.S. 1, 7 [16 L.Ed. 2d 314, 319, 86 S.Ct. 1245].)

[18]Defendant's first trial was marred by inadequate instructions (*People* v. *Modesto, supra,* 59 Cal.2d at pp. 727-731), improper evidentiary rulings (*id.* at pp. 732-733), prosecutorial misconduct (*id.* at p. 734), and the introduction of parole statistics (*id.* at p. 735) which we have since held inadmissible (*People* v. *Morse, supra,* 60 Cal.2d 631) and which would have entitled the defendant to a new penalty trial (*In re Jackson* (1964) 61 Cal.2d 508 [39 Cal.Rptr. 220, 393 P.2d 420]).

The conviction in defendant's second trial rested in part upon an unlawfully obtained confession (*People* v. *Modesto, supra,* 62 Cal.2d at pp. 445-446) and in part upon unfavorable references to defendant's refusal to testify (*id.* at p. 447), in violation of the defendant's privilege against self-incrimination (*Griffin* v. *California,* supra, 380 U.S. 609).

[19]To the extent that the multiple errors in the previous proceedings contributed to the verdicts obtained in defendant's first two trials, the errors were indirectly repeated at the present trial every time the jury was invited to rely upon the conclusions embodied in the earlier verdicts.

prevented the most harmful comments from ever reaching the jury; and an appropriate instruction could have prevented those remarks which *did* reach the jury from exerting any impact beyond that of defense counsel's own statements. Under such circumstances, an objection may not be made for the first time on appeal. (See *People* v. *Purvis* (1963) 60 Cal.2d 323, 343 [33 Cal.Rptr. 104, 384 P.2d 424]; cf. *Henry* v. *Mississippi, supra*, 379 U.S. 443, 448-452 [13 L.Ed.2d 408, 413-416, 85 S.Ct. 564].)

The judgment is affirmed.

Traynor, C. J., McComb, J., Burke, J., Sullivan, J., and White, J.,* concurred.

PETERS, J.—I dissent.

In my opinion the judgment appealed from once again must be reversed. This is so because several errors were committed by the prosecution during this trial. While recognizing that some of these errors were very serious indeed, the majority hold that they were not prejudicial. In doing so, they purport to apply the federal test of prejudicial error announced in *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], but in my opinion do not do so.

The majority correctly state that the evidence is overwhelming that the two girls were killed, and that the evidence overwhelmingly demonstrates that defendant killed them. They therefore conclude that, in view of this record, there is no reasonable possibility that other than a guilty verdict could have been returned. If guilt or innocence were the only issue involved I would agree with this analysis. But guilt or innocence was not the only issue involved. Here there was also involved the degree of guilt. On this issue, unlike the guilt or innocence issue, the evidence was not overwhelming or conclusive. There was a very grave question as to whether the defendant was so intoxicated that the degree of the crime was reduced to second degree or manslaughter. There was also a grave question as to whether, even if defendant was not so intoxicated as to reduce the degree, he was so intoxicated that he should not suffer the death penalty. While I agree that the several errors involved could not and did not affect the determination of guilt, I cannot say that there is no "reasonable

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

718

possibility" that they did not affect the determination of the degree of the crime.

We should have clearly in mind the federal test of prejudicial error, here applicable. It was recently restated in the *Chapman* case, *supra,* which followed *Fahy* v. *Connecticut,* 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]. In that case it was held that error must be deemed prejudicial unless it can be said that there is no "reasonable possibility" that the error complained of might have contributed to the conviction (p. 86, 11 L.Ed.2d p. 173). *Chapman, supra,* specifically reaffirmed this language and then held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*386* U.S. at p. 24 [17 L.Ed.2d at pp. 710-711, 87 S.Ct. at p. 828].) Under this rule, once error is found, it is prejudicial and therefore reversible unless the appellate court can affirmatively find that there is no "reasonable possibility" that the error might have contributed to the conviction. No such affirmative finding can be made here.

In the instant case, there were several serious errors. One of the most serious with which the majority show great concern, and rightly so, was the prosecutor's repeated comments on the defendant's failure to take the stand and explain damaging evidence against him. This necessarily included evidence that he was not intoxicated. The majority frankly concede that in his closing argument the prosecutor "repeatedly exploited" this fact, and on at least one occasion directly violated the rule laid down a year before the present trial in *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. Repeatedly, he commented on this failure of defendant to explain adverse evidence against him. The prosecutor time and time again impliedly argued that defendant could have explained but did not, thus at least implying that silence constitutes an admission. That argument was clearly erroneous and most prejudicial. The tacit admission rule has been repudiated, insofar as police accusations are concerned, by the United States Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and by this court in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Cockrell,* 63 Cal.2d 659, 669 [47 Cal.Rptr. 788, 408 P.2d 116]; and *People* v. *Ridley,* 63 Cal.2d 671, 676 [47 Cal.Rptr. 796, 408 P.2d 124]. (See also *People* v. *Ellis,* 65 Cal.2d 529, 536 [55 Cal.Rptr. 385, 421 P.2d 393].) The

repeated references of the prosecutor to the defendant's silence were clearly improper. Can we affirmatively declare that there is no "reasonable possibility" that these repeated references could not have convinced at least one member of the jury to vote for first degree rather than some other reduced degree, and could not have induced at least one member of the jury to vote for the death penalty rather than life? Of course not.

The repeated arguments made by the prosecutor about the failure of the defendant to explain the evidence against him must have, and certainly could have, hit the defendant's defense of diminished responsibility by reason of intoxication with devastating effect. I am unable to make an affirmative declaration that there is no "reasonable possibility" that these errors could not have affected the verdict so far as the degree of the crime is concerned.

Another most serious error is also chargeable to the prosecutor. Not only did he impress upon the jury his personal belief in the defendant's guilt of first degree murder, but he made repeated and persistent references to the prior trials in which 24 jurors and 2 judges had already passed upon those issues, which necessarily included the defense of diminished responsibility. The majority forthrightly admit that these arguments overstepped the bounds of propriety and were erroneous, but hold the error not prejudicial because the defendant failed to object, and an admonition could have cured the error. This is most unrealistic. The erroneous argument must have had a shattering effect on defendant's defense of diminished responsibility. Once made, no admonition could erase from the jurors' minds the personal opinion of the prosecutor and his statements that two judges and twenty-four jurors had already decided that defendant was guilty of first degree murder, and had repudiated the defense of diminished responsibility. This case is not unlike *People* v. *Brock, ante,* p. 645 [58 Cal.Rptr. 321, 426 P.2d 889], recently filed, in which the trial judge opined that defendant was guilty, and then admonished the jury that they were the sole judges of the facts. The admonition, given in that case in an instruction, did not cure the error. An admonition here would have been equally ineffectual.

Another serious error which I cannot dismiss as cavalierly as do the majority is the erroneous discussion of the insanity defense—that if found insane defendant would be "turned loose." The majority frankly concede that this was error and

most serious error, but conclude that it could not have been prejudicial because the plea of insanity was later withdrawn. Obviously the error did not affect the sanity issue, because that issue became moot when it was withdrawn from the jury. But the argument could well have had a most serious impact on the jury. It, in effect, told the jury that any other verdict than death conceivably could result in turning loose the defendant to kill again. This, of course, violated *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]. I cannot say that there is no ''reasonable possibility'' that the argument did not have this effect.

Thus there were errors, serious errors, committed during this trial. Although it is not reasonably possible that those errors could have affected the finding of guilt, there is far more than a reasonable possibility that such errors could have affected the finding of the degree of the crime and the imposition of the death penalty. For these reasons I would reverse the judgment.

Appellant's petition for a rehearing was denied June 21, 1967. White, J.,* sat in place of Mosk, J., who deemed himself disqualified. Peters, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.