[Crim. No. 7045.    Second Dist., Div. Two.    June 16, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. GERALD GLEN BOYDEN, Defendant and Appellant.

Gerald Glen Boyden, in pro. per., and Earl Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, C. Anthony Collins and Jack K. Weber, Deputy Attorneys General, for Plaintiff and Respondent.

HERNDON, J.—The apparently unending story of this case is truly a remarkable one. It was on a night almost eight years ago that the Finkelstein Supply Corporation was robbed of $3,866 by a man armed with a deadly weapon. On Septem-

ber 3, 1959, an information was filed charging appellant Gerald Glen Boyden with this crime and also with two prior felony convictions.

Boyden at first denied, but later admitted, his former convictions. After a jury trial he was found guilty of robbery in the first degree. The judgment of conviction was entered on October 16, 1959. Boyden appealed from this judgment.

On May 18, 1960, we filed our opinion in *People* v. *Boyden*, 181 Cal.App.2d 48 [4 Cal.Rptr. 869], affirming the judgment. We denied a rehearing on May 27, 1960. Our Supreme Court denied a hearing on July 12, 1960. Appellant's petition for writ of certiorari to the United States Supreme Court was denied by that court on April 3, 1961. (*Boyden* v. *California*, 365 U.S. 650 [5 L.Ed.2d 857, 81 S.Ct. 833].)

Four and one-half years later, on August 26, 1964, we were required to recall the remittitur by reason of the mandate of *Douglas* v. *California*, 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814]. We appointed counsel to represent appellant on this second review.

On October 26, 1965, after again reviewing the record and considering all the assignments of error that had been urged by appellant's counsel and in the briefs filed by appellant in propria persona, we filed our second opinion again affirming the judgment. (*People* v. *Boyden*, 237 Cal.App.2d 695 [47 Cal.Rptr. 136].) We denied appellant's second petition for rehearing, and on December 22, 1965, our Supreme Court again denied appellant's petition for a hearing.

Thereafter appellant again appealed to the United States Supreme Court. That court, at its October Term, 1966, granted appellant's motion for leave to proceed *in forma pauperis* treating his latest appeal as a petition for writ of certiorari. On March 13, 1967, the United States Supreme Court rendered its *Per Curiam* decision reading as follows: "The motion for leave to proceed *in forma pauperis* is granted. The judgment is vacated and the case remanded for further consideration in light of *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]."

Our judgment of October 26, 1965, having been vacated by the ensuing mandate of the United States Supreme Court, we again recalled the remittitur issued herein, reinstated this appeal for further consideration in the light of *Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824], and allowed counsel for appellant and for the People to file supplemental briefs.

For the third time we have reviewed this record and have considered all of the errors assigned by and on behalf of appellant. We adhere to the views expressed in our previous opinions and reiterate our conclusion that this appeal is without merit.

As we noted in our prior opinions, the incriminating evidence was overwhelming and established "a clear case of unquestionable guilt." As we stated in our last previous opinion:

"The case itself was a simple one. Following the commission of an armed robbery (1) appellant had been captured within hours thereafter in possession of the loot; (2) he had been positively identified by the victim; (3) the car and gun he had used in the robbery had been located and identified; (4) he had freely and voluntarily confessed to the crime, both orally and in writing; and (5) he presented no affirmative defense at his trial, neither calling any witnesses nor testifying himself." (Page 696 [237 Cal.App.2d].)

With respect to the error in the instruction concerning the inferences that might properly be drawn from appellant's failure to testify and in the prosecutor's comment thereon, we would emphasize first that the prosecutor's comments were very brief and restrained, and secondly, and perhaps more importantly, that the comments of counsel for the People were invited and made necessary by the grossly improper arguments of appellant. Notwithstanding his failure to take the stand, appellant made a lengthy argument in which he repeatedly went outside the record and made statements which amounted to unsworn testimony.

In his brief opening argument, reported in full on only four pages of transcript, the deputy district attorney made no reference to the instruction to be given by the judge on the subject of appellant's failure to testify and did not urge the jury to draw any inference therefrom. However, he did open his argument with the following prophetically accurate observation:

"If it please the Court, Mr. Boyden, ladies and gentlemen of the jury. As the Court stated to you, what I say to you now is not testimony by any means, and I don't wish you to take my statements as evidence. The same is true of the statements of Mr. Boyden at the time when he gets up to speak to you. He may state things to you in his argument which were not brought out by the evidence, and I wish to urge you to consider his statements at that time not as his testimony under

oath where he can be cross-examined; I merely wish to ask you to consider his statements as argument and not place the weight to it that you would give to evidence." Thereafter, he presented a brief and unimpassioned summary of the evidence demonstrative of appellant's guilt.

From the very beginning of his argument that extends over 20 pages of transcript appellant proceeded to make numerous statements of purported fact which were entirely outside the record and unsupported by it. For example, in commenting on the testimony given by the victim of the robbery, he stated: "The police report is not in evidence, but the report that he made to the police he stated he has no idea what color clothes the robber wore."

Appellant next accused the prosecution of bad faith in failing to ask the victim while he was on the stand to identify seventy $1.00 bills, three $5 bills, and the twenty-two $10 bills recovered from appellant. He concluded this dissertation by an obvious plea for sympathy and burst into an extremely prejudicial accusation against his cousin to whom he had made his initial voluntary and unsolicited confession. (See *People* v. *Boyden, supra,* 237 Cal.App.2d 695, 698.) In the course of his argument he stated:

"I don't think the question of guilt or innocence should hinge upon legal trickery. I didn't come here to match legal wits with the judge or prosecutor. I'm not a lawyer, and you all know that. But I have hoped to put on a defense in which you people could use common sense and reasoning and logic and ascertain the fact that I have robbed no one. But what kind of defense can I put on? *The main thing that they have been trying to keep from you is the fact that my cousin is going with my wife.*" (Italics added.)

The prosecution objected to this obviously improper argument and the court advised the jury that it should disregard any statement going outside the evidence that had been introduced during the trial.

Undaunted, however, appellant continued: "If you remember clearly, when I was talking [to the victim] yesterday, this Laumann, questioning him about his eyesight, how good he could see, the judge and prosecutor cut me off then because in their opinion it is immaterial how well he can see. When I questioned my cousin about his relation with my wife, they cut me off then because they said that has nothing to do with the case. Trying to cut me off now. That's the case. . . . How

can I show you how I'm being framed? Everything that I show you along that line they chop it off. Well, that has nothing to do with the case. That is immaterial. Whether this man can see or not makes no difference. That's what they'll have you believe. Whether or not my cousin has relations between him and my wife, they want you to overlook it.''

The incident involving the victim's eyesight demonstrates, as appellant must have known, that his characterization of the attitude of court and counsel was wholly false. After the victim had indicated that he had worn glasses for several years, the following is reported: ''Q. [APPELLANT]: What is the trouble with your eyes? . . . A. Well, that I couldn't exactly say except that I need them for reading or work, close work. For driving or distance I don't use my glasses. Q. You mean you have worn glasses for seven years and you don't know what is the matter with your eyes? MR. FUKUTO [Deputy District Attorney]: I will object to the question as being argumentative. THE COURT: Well, sustained. [APPELLANT]: It is not argumentative, your Honor. THE COURT: No. I have ruled on it. [APPELLANT]: Okay. Just incredible. . . . Q. [APPELLANT]: Are you nearsighted? A. Not nearsighted. Q. Farsighted? A. Farsighted. Q. Why didn't you say that in the beginning?''

The following are examples of appellant's conduct while cross-examining his cousin: ''Q. [APPELLANT]: Now, what is your religion, Officer Jordan, if I may ask? . . . THE COURT: What would the materiality of the religion have to do with it? [APPELLANT]: I want to know whether or not he believes in telling the truth when he takes an oath to swear to tell the truth and the whole truth, so help him God. I want to know if he is sincere or if he is just playing a game. THE COURT: Objection sustained. . . .

''Q. [APPELLANT]: I'd like to ask you, Detective Jordan, if you are acquainted with [my] wife, Mrs. Ernestine June Boyden? A. Yes, I know her. Q. I would like to ask you if when [I] was out of town you had intimate relations with her? . . . A. No. Q. You have never been intimate with Mrs. Boyden? A. No, I haven't. . . . Q. Were you acquainted with Mrs. Emma Jordan? A. That's my wife. That's my wife, yes. Q. Was she a drug addict? MR. FUKUTO: I will object to all this. THE COURT: Objection sustained. . . . Q. [APPELLANT]: Detective Jordan, I understand your wife was recently murdered, is that true? MR. FUKUTO: I will object to the question as not being material. THE COURT: Objection sustained.

[APPELLANT] : Well, that is all I will ask this witness at this time, your Honor.''

Continuing his argument, appellant next quoted from a document which he had kept from being received into evidence through his objections thereto. Thereafter, although he had not called to the stand the witnesses he had subpoenaed into court, he proceeded to tell the jury what these witnesses *would have* testified to if they had been called and had testified truthfully:

''While I am standing here talking to you, I know you probably don't believe me. None of my witnesses have testified. There's only one way I can prove what I have said: Through his mother, his father, my mother, a doctor and his wife. . . . Even yesterday morning I thought that there was a possibility of justice, but when my own aunt says no, she's not going to take the stand and make her only son out a liar—I said, 'All I want you to do is tell the truth'—she said, 'No. No.' So I started to put her on the witness stand anyway, but what am I supposed to do, put her on the stand and charge her with perjury because she won't tell the truth? That's my aunt. . . .

''Although my cousin isn't what he's supposed to be, all the police aren't like that. . . . You have to admire them because they are clean-cut and they are courteous. But, now, my cousin, you saw him on the witness stand. He's evasive. He can't look you in the eye. He can't face me. Anything he wants to relate to help me they cut me off. This doctor is our family doctor that I had on subpoena that called and said he was, vanished, gone out of town on emergency, he knows Detective Jordan. *He can testify that the man has been under psychiatric treatment for I don't know how long.*'' (Italics added.)

Despite all these many obviously calculated efforts by appellant to introduce grossly improper and scandalous matter in the guise of argument, the deputy district attorney continued to display the restraint and fairness that characterized his conduct throughout trial. In closing he contented himself with the following appropriate observation:

''Again I'd like to emphasize to you, ladies and gentlemen, that I urge you to consider the evidence only in this case, and again remind you that what Mr. Boyden just stated to you is argument only. None of it carries the weight of evidence. None of these statements that he made to you did he make under oath, and I was not permitted to question him as to the

various statements that he made. . . . Again I want to state to you, ladies and gentlemen, that just please consider only the evidence that you heard from the witness stand. On that basis the only evidence—and also the evidence, exhibits introduced to you—but the only evidence that you can consider all points to the defendant's guilt. There is no evidence on the other side whatsoever.

"The Court will read you an instruction regarding the failure of the defendant to testify, and I don't know the exact words of it. I wish you would listen to that instruction very carefully. But I believe the Court will state that facts within the defendant's own knowledge, well, you can't infer that to be true, something about that. Listen to that instruction. I wish to draw that to your attention. Mr. Boyden didn't take the stand. He didn't say where he was at that time. He didn't say, 'I didn't commit the robbery.' He didn't say that that confession was false, that he was forced to write it, that he was beaten or bruised. He wants you to say it for him, I take it. I submit to you, ladies and gentlemen, that the evidence in this case all points to the defendant's guilt and justice does demand a verdict of guilty in this case. Thank you very much."

The limited, restrained and invited comment above quoted contrasts with the "machine-gun repetition of a denial of constitutional rights, all designed and calculated to make petitioners' version of the evidence worthless" as set forth in the appendix to *Chapman* v. *California, supra,* 386 U.S. 18, 26-42 [17 L.Ed.2d 705, 711-720, 87 S.Ct. 824] (Cf. *People* v. *Modesto,* 66 Cal.2d 695, 714 [59 Cal.Rptr. 124, 427 P.2d 788].) In affirming the judgment in this case for the third time, we declare our belief that the error here presented was harmless beyond a reasonable doubt.

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied July 12, 1967, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1967. Mosk, J., did not participate therein.