Filed 11/5/24  P. v. Holder CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ERIC RONALD HOLDER, JR.,<br><br>　　　Defendant and Appellant. | B328849<br><br>(Los Angeles County<br>Super. Ct. No. BA475908) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  H. Clay Jacke II, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven E. Mercer and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Eric Holder appeals the judgment entered following a jury trial in which he was convicted of the first degree murder of Ermias Asghedom (Pen. Code,[1] § 187, subd. (a); count 1), two counts of attempted voluntary manslaughter (§§ 664/192, subd. (a); counts 2 & 4), two counts of assault with a firearm (§ 245, subd. (a)(2); counts 3 & 5), and one count of possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6). The jury found true the firearm and great bodily injury enhancement allegations. Appellant's sentence of 60 years to life includes a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).

Appellant contends the trial court abused its discretion when it sustained the prosecution's objection to a portion of defense counsel's closing argument which purported to describe what appellant was thinking and feeling prior to the shooting. Appellant asserts the erroneous limitation on his closing argument violated his federal constitutional right to present a defense. Appellant further argues the trial court misapprehended the recently amended statutory scheme, and thereby abused its discretion when it declined to dismiss the 25-year-to-life firearm enhancement under section 1385, subdivision (c). We disagree on both points, and affirm.

## FACTUAL BACKGROUND

Ermias Asghedom was a member of the Rolling Sixties gang who eventually rose to stardom as the rap musician "Nipsey Hussle." Following his success as a rap artist, Asghedom invested his money in the South Central Los Angeles community where he grew up, purchasing a strip mall that had long been a

---

[1] Undesignated statutory references are to the Penal Code.

popular place for people in the neighborhood to congregate.  The mall was in "the heart of South Central" as well as Rolling Sixties territory.

Asghedom leased a portion of the property to commercial tenants, while operating other businesses himself, including The Marathon clothing store.  Asghedom's brother, Sam, ran the day-to-day operations of The Marathon, and Herman Douglas, a former Rolling Sixties gang member known as "Cowboy," worked for Asghedom at the store.  Asghedom visited The Marathon daily when he was in town, and people in the community were accustomed to seeing him there.  He regularly took photographs with fans and spoke with his employees in the store or in the parking lot.

Appellant grew up in South Central Los Angeles and knew both Asghedom and Douglas.  He was also a member of the Rolling Sixties, known in the gang as "Shitty" or "Shitty Cuz."

Bryannita Nicholson met appellant in February 2019, when appellant was living with his uncle in Long Beach.  Appellant lived next door to the building Nicholson was preparing to move into, and they quickly became friends, seeing each other about every other day.  In the first week after they met, Nicholson went to a music studio in the Long Beach home of appellant's cousin, where appellant was recording rap music.  Nicholson saw appellant's cousin hand him a long silver semiautomatic gun, which appellant placed in the front of his waistband.  A few days later, Nicholson went to appellant's house and saw a gray revolver with duct tape on the handle on the sofa next him.  He quickly put it away when she asked about it.  After that, Nicholson noticed appellant carrying a black semiautomatic

handgun "just about" every time she saw him. Appellant told Nicholson he carried a gun for protection.

Appellant called Nicholson on Sunday, March 31, 2019, and asked if she wanted to hang out and get something to eat. Nicholson picked appellant up in Long Beach around 1:30 p.m., and appellant suggested they drive to Los Angeles. Appellant directed Nicholson to a street near The Marathon and had her stop the car. Appellant got out and greeted "a whole bunch of dudes." Nicholson could not hear what was said, but it appeared friendly. Appellant returned to the car less than two minutes later.

From there, appellant had Nicholson drive to the strip mall. Asghedom had just arrived and was standing in the center of the parking lot in front of The Marathon, talking with Douglas and Evan McKenzie, who was known as "Rimpau." As Nicholson pulled into the parking lot, she recognized Asghedom and told appellant she wanted to take a picture with him. When Asghedom saw Nicholson's car, he asked McKenzie, " 'Is that Shitty?' " McKenzie said, "Yeah," and Asghedom said out loud to himself, " 'Oh, I wonder how this is going to go down.' "

Appellant got out of the car and went into Master Burger, at one end of the L-shaped strip mall. He then walked over and greeted Asghedom, McKenzie, and Douglas, shaking hands with each of them. Asghedom said to appellant, " 'Hey, man, what's up? You know, where you been bro?' " Appellant responded, " 'I been gone.' " Asghedom then said, " 'Man, you know, they got some paperwork on you, you know. I haven't read it, you know,

4

like, you my bro. You know, like, you need to maybe take care of that, you know.' "[2]

Douglas described the conversation as one between friends. There was no tension, and Asghedom spoke respectfully to appellant. According to Douglas, Asghedom was looking out for appellant, suggesting he should clarify the rumors that paperwork existed on him for appellant's own sake; he was not accusing appellant of cooperating with authorities. Appellant responded by dismissing the notion that he had cooperated with police, stating, " 'They be hatin' on me. . . . It's some bullshit."

While Asghedom and appellant were speaking, Nicholson got out of her car and approached the group, hoping to take a picture with Asghedom. She only heard fragments of the conversation, but it seemed like appellant was trying to clarify an allegation that he had snitched in the past. Appellant did not appear angry or upset, his tone of voice was normal, and Nicholson sensed no animosity between the two men during their conversation. Asghedom was "chill" toward appellant, but seemed to be "trying to brush him off so he [could] leave. Like, he didn't really want to talk."

Nicholson took a picture with Asghedom and returned to her car while appellant remained with Asghedom and the other men. Before leaving, appellant shook hands with Asghedom, Douglas, and McKenzie. Appellant returned to the Master Burger for his order, and then walked back to the group of men in

---

[2] Douglas explained that "paperwork" refers to documentation demonstrating that someone has cooperated with law enforcement, such as police reports or court transcripts. "Paperwork" may also be used to disprove rumors or allegations of such cooperation.

the parking lot. Before returning to Nicholson's vehicle, appellant shook hands with everyone except Asghedom, who was engaged in another conversation.

After appellant and Nicholson left, Asghedom remained in the strip mall parking lot, talking with Douglas, McKenzie, and others. Kerry Lathan and his nephew, Shermi Villanueva, arrived and joined the conversation. Douglas went inside to eat his lunch. When Douglas left the parking lot, Asghedom was in a good mood, and nothing seemed out of the ordinary.

Upon returning to the car, appellant ate some of his food and then told Nicholson to pull out of the parking lot and drive around the block. As Nicholson drove, appellant began loading a black semiautomatic handgun. They passed in front of the strip mall again, and appellant pointed the gun at the passenger side window toward the mall. Nicholson told him to put the gun down. Appellant put the weapon at his side and continued eating his food. Appellant directed Nicholson to stop in an alley next to Master Burger. He put on a red shirt and resumed eating as he sat in the vehicle. Then appellant said to Nicholson, " 'Wait. Don't go nowhere. I'll be back.' " He did not seem angry or upset. Appellant got out of the car and walked down the alley toward the strip mall.

As he approached Asghedom, appellant said to him, " 'You're through.' " Appellant then opened fire with two handguns, a semiautomatic and a revolver, shooting Asghedom 11 times. Asghedom collapsed to the ground and later died as a result of multiple gunshot wounds. Appellant also shot Lathan in the back. Following the shooting, Lathan was only able to walk with a walker, and a few weeks later he suffered a stroke that left him confined to a wheelchair. Appellant shot Villanueva in

6

the abdomen, but the bullet struck Villanueva's belt buckle and did not penetrate his body.

After the shooting, appellant kicked Asghedom in the head before fleeing the scene. Appellant ran back to Nicholson's car with a gun in each hand, one chrome and one black. He got in, and in a loud voice ordered Nicholson to drive away. Nicholson asked appellant what had happened, and he responded, " 'You talk too much. I ought to slap you.' "

## DISCUSSION

I.  **By Sustaining the People's Objection to Portions of Defense Counsel's Closing Argument, the Trial Court Neither Abused Its Discretion Nor Violated Appellant's Constitutional Right to Assert a Defense**

Appellant contends the trial court erroneously limited his defense counsel's closing argument, thereby abusing its discretion and violating appellant's federal constitutional right to present his defense. We disagree.

### A. *Relevant proceedings*

Defense counsel began his closing argument by admitting that appellant shot and killed Asghedom. He argued, however, that the killing constituted voluntary manslaughter and not murder because appellant acted in the heat of passion after publicly being called a snitch by Asghedom, the famous rapper known as Nipsey Hussle. "Nipsey Hussle," defense counsel asserted, "already had a confrontational state of mind," as evidenced by his statement, " 'I wonder how this is going to unfold' " when he saw appellant in the parking lot. Appellant, by contrast, had "an innocent state of mind. . . . [H]e's thinking, okay. I'm not in the gang anymore. I'm not active, but I'm not

7

going to snub them." Counsel continued, "Think about [appellant's] state of mind at this point, you know. . . . [¶] So [appellant's] state of mind is thinking what's going on, you know. I'm in this group. I'm surrounded by these guys, the Rolling Sixties. I grew up with them in the neighborhood, and now Nipsey Hussle is outing me as a snitch."

Defense counsel then told the jury that "someone with Nipsey Hussle's status and knowledge of growing up in the Rolling Sixties would know that this was a serious accusation with serious possible consequences to [appellant]." Such consequences include "[e]verything from getting beat up to getting killed." "So [appellant] tries to figure out what it is that Nipsey's—what is Nipsey's motive. What is his motivation."

At this point, the prosecutor requested a sidebar and objected to defense counsel's argument on the ground that counsel was purporting to tell the jury what his client was thinking, even though appellant did not testify and there was no other evidence about what was going through his mind. Defense counsel responded that he was simply drawing reasonable inferences from the evidence based on what a reasonable person would be thinking under these circumstances. The trial court told defense counsel he could talk about what a reasonable person would be thinking, "but you can't say [appellant] thought it because there's no testimony that [appellant] thought it."

Defense counsel resumed his argument: "This was a serious accusation. [Appellant] took it serious as it was. He knows the consequences of being called a snitch in this manner." Asserting that Nipsey Hussle's refusal to respond to appellant's requests for details about the paperwork prevented appellant from clearing his name, defense counsel argued:

8

"So a person, a reasonable person, under those circumstances may conclude this is just Nipsey Hussle calling me a snitch. I know there's no paperwork out there. He's not giving me any details. This is just something that he's passing around in the neighborhood, right. . . . It's just Nipsey Hussle that's saying this, this accusation against him putting a snitch jacket on him. This is a provocation that stirs up rage and powerful emotions. A swirling around the head, rage that he would do this in public in the heart of Rolling Sixties territory in a complex that he owns when he just—when [appellant] just came there to buy food. [¶] Confusion. Why is he doing this? What's his motive? What is he talking about? Frustration. Refuses to give him any names or any details."

The prosecutor reasserted the same objection, and the court held another sidebar. Defense counsel insisted he had followed the court's admonition by referring to the "reasonable person's" response to being called a snitch. Noting that counsel had mentioned his client in the same breath as the reasonable person, the trial court stated:

"You have to walk a fine line in the use of the evidence, and the inferences from that evidence and not say what [appellant] thought. It sounds as if . . . you're saying my client or [appellant] thought this based upon that. . . . What's the reasonable person going to think under those circumstances, that's fine. But you got to walk that fine line." The court added, "It kind of sounded like your client is saying what—what is happening to me. And you've indicated that's not what you meant, but that's how it sounded to me. What is—what is [appellant] thinking. But you're saying it's the—you're just talking about the average person thinking, correct?" Defense counsel confirmed that was

9

what he was doing, and the court said, "All right.  Just make that clear.  We don't have an issue."

Defense counsel continued:

"So consider how you would feel as a reasonable person if you just come around and then all of a sudden you're being called a snitch, and then when you press for details the person gets irritated with you because you keep asking them to explain what they're talking about.  And they brush you off and that [*sic*] you need to go somewhere.  You would think that this is Nipsey Hussle making up this rumor about me. . . . [¶] . . . So you would think that he's putting a bounty on me.  He's outing me as a snitch.  This is Nipsey Hussle making it up.  [No one else there said] anything. . . .  This was just Nipsey Hussle's doing.

"So this is a provocation.  This would stir up a range of powerful emotions swirling around the reasonable person's head in the same or similar circumstances.  Some of the emotions would be rage.  You'd be enraged that he would do this to you in public in the heart of Rolling Sixties territory in a complex that he owns in front of other people when you just came to get some food.

"Confusion.  You don't know what he's talking about.  He's not giving you any details.  Why is he doing this to me?

"Frustration.  Refusing to give you any names, any details so that you could get this supposed paperwork and clear your name.

"Humiliation.  Doing this in front of [others].

"And fear for your life and safety.

"Nipsey Hussle carries a lot of weight.  What if he calls you a snitch in a song and names you?  These are the things that you would be considering as to why he's doing this in this public

10

manner.  Now, if he was just looking out for you and trying to warn you about this rumor, why not walk you over to the side and say, hey, this is what I heard.  You might want to go take care of it, you know.  I'm just looking out for you.  You better watch your back.  No.  Didn't do that.  He did it in front of four other people."

Defense counsel went on to tell the jury that just nine minutes after this serious life-threatening provocation, while acting in the heat of passion, appellant shot and killed Asghedom.  Nine minutes, counsel emphasized, is not enough time to reflect after such a provocation.  It is not a cooling off period.  Counsel then outlined the jury instructions regarding heat of passion and discussed how they applied to appellant's actions in this case.

Defense counsel concluded, "So I wanted you to see all of the circumstances that led up to March 31st to see that [appellant] had no animus and that it was this provocation by Mr. Asghedom that caused [appellant] to become so enraged that he acted rashly without reflecting, without a cooling off period, and that this was voluntary manslaughter in a heat of passion."

## B. *The trial court properly limited defense counsel's closing argument*

"Criminal defendants enjoy a constitutional right to have counsel present closing argument to the trier of fact."  (*People v. Simon* (2016) 1 Cal.5th 98, 147 (*Simon*); *Herring v. New York* (1975) 422 U.S. 853, 858 [45 L.Ed.2d 593, 95 S.Ct. 2550] ["There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial"].)  This right, however, is subject to the trial court's "broad discretion to control the duration and scope of closing

11

arguments." (*Simon,* at p. 147; *People v. Edwards* (2013) 57 Cal.4th 658, 743; (§ 1044 [it is the duty of the trial court to limit "the argument of counsel to relevant and material matters"].)

"We review a trial court's decision to limit defense counsel closing argument for abuse of discretion." (*Simon, supra,* 1 Cal.5th at p. 147.) "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133–134; *People v. Thomas* (2011) 51 Cal.4th 449, 494; *People v. Stankewitz* (1990) 51 Cal.3d 72, 102 ["It is axiomatic that counsel may not state or assume facts in argument that are not in evidence"].) Moreover, a trial court may prohibit an argument by counsel if there is "no substantial evidence" to support it. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1388; *People v. Modesto* (1967) 66 Cal.2d 695, 708 ["defendant's failure to take the stand does not entitle his attorney to engage in purely speculative argument, substituting his own testimony for that of the defendant in order to insulate the theory of the defense from the scrutiny of cross-examination"].)

Here, the trial court properly sustained the prosecution's objections to the portions of defense counsel's closing argument that purported to tell the jury what appellant was thinking or feeling before he shot Asghedom. Appellant did not testify, and no other evidence about what appellant was thinking or feeling prior to the shooting was presented to the jury. Thus, the inferences about appellant's specific thoughts and feelings that defense counsel purported to draw were not based on the evidence, and the trial court did not abuse its discretion in

limiting that portion of counsel's argument. (*People v. Valencia* (2008) 43 Cal.4th 268, 284 [counsel may not " 'argue facts or inferences not based on the evidence presented' "].)

Appellant's reliance on *People v. Tafoya* (2007) 42 Cal.4th 147 (*Tafoya*) and *People v. Farnam* (2002) 28 Cal.4th 107 (*Farnam*) to support his claim that the trial court abused its discretion is misplaced.

In *Tafoya*, the defendant asserted that the prosecutor had assumed facts and misstated the evidence in closing argument by contradicting the defendant's testimony and stating that the defendant was personally armed in the commission of the offense. (*Tafoya, supra*, 42 Cal.4th at p. 181.) Our Supreme Court rejected defendant's claim on the ground that other evidence showed that "defendant had the gun on his lap as [he] drove away from [the victim's] house." (*Ibid.*) The court held that "no other witness so testified to [defendant's] version of events," and "the prosecution's argument that defendant was armed during the getaway was consistent with the evidence and not improper." (*Ibid.*) Here, unlike *Tafoya*, there was no evidence whatsoever to support the inferences counsel was attempting to draw when he told the jury what appellant was thinking and feeling before the shooting. The trial court thus properly limited defense counsel's argument in this regard.

*Farnum* is equally unavailing to appellant. In that case, defendant argued the prosecutor had misled the jury by mischaracterizing the evidence and improperly drawing an inference on the issue of premeditation and deliberation. (*Farnum, supra,* 28 Cal.4th at p. 169.) Our Supreme Court recounted the evidence presented at trial which supported the prosecutor's inference and rejected defendant's claim, stating,

13

"On this record, we cannot say that the prosecutor acted improperly in presenting her theory of premeditation and deliberation." (*Id.* at p. 170.)

By contrast, in the instant case defense counsel did not frame his closing argument in terms of what appellant could or may have been thinking based on the evidence. Instead, counsel purported to tell the jury what appellant had actually been thinking and feeling before he shot Asghedom. In the absence of any evidence about appellant's personal state of mind, the argument was impermissible, and the trial court properly limited it.

Appellant further asserts that defense counsel "was literally prohibited from mentioning his client's name" and was forced to "inject 'reasonable person' into every sentence" to avoid further interruptions. He thus contends the "limitation on counsel's argument deprived appellant of his right to have counsel argue both objective and subjective provocation." Not so.

The trial court acts within its discretion when its limitation on defense counsel's argument does not prevent the defendant from conveying his primary defense. (*Simon, supra,* 1 Cal.5th at p. 149 [no abuse of discretion where trial court's restriction on defense argument did not prevent counsel from making central arguments to jury].) Significantly, appellant's jury was never informed of the nature of the prosecutor's objection to defense counsel's argument, much less the trial court's ruling on the objection. The trial court did not order defense counsel's statements about appellant's thoughts and feelings stricken, nor did the court admonish the jury to disregard those remarks. The jury therefore heard and considered defense counsel's arguments attributing specific thoughts and feelings to appellant, including:

(1) Why would the great Nipsey Hussle call me a snitch in public? "I'm not involved in [the gang] lifestyle anymore." "What's going on?" (2) "So [appellant] tries to figure out what . . . is Nipsey's motive. What is his motivation." (3) "This was a serious accusation. [Appellant] took it serious as it was. He knows the consequences of being called a snitch in this manner." (4) "This is a provocation that stirs up rage and powerful emotions. A swirling around the head, rage that [Nipsey Hussle] would do this in public in the heart of Rolling Sixties territory in a complex that he owns . . . when [appellant] just came there to buy food." Defense counsel concluded his argument by telling the jury, "[Appellant] had no animus and . . . it was this provocation by Mr. Asghedom that caused my client to become so enraged that he acted rashly without reflecting, without a cooling off period."

Apart from relating appellant's specific thoughts and feelings to the jury, defense counsel argued at length that a reasonable person would have reacted with passion rather than reason to being accused of snitching by Asghedom in front of other gang members. These allusions to the "reasonable person" in defense counsel's argument unmistakably referred to appellant and his mental state at the time of the shooting.

In short, nothing in the trial court's rulings prevented appellant from arguing objective and subjective provocation to the jury, or from clearly articulating the defense theory that "appellant acted in the heat of passion as a result of being publicly called a snitch" by "the famous, the great Nipsey Hussle." The trial court did not abuse its discretion in prohibiting defense counsel from telling the jury what appellant was thinking and feeling at the time of the shooting to explain appellant's conduct.

15

## II. The Trial Court Did Not Abuse Its Discretion in Declining to Dismiss the 25-Year-to-Life Firearm Enhancement Under Section 1385, Subdivision (c)

Appellant contends that based on the substantial mitigation evidence of childhood trauma and severe mental illness, the trial court's refusal to strike the 25-year-to-life firearm enhancement constituted an abuse of discretion. We disagree.

### A. *Relevant proceedings*

Prior to sentencing, appellant filed a sentencing memorandum in which he asked the trial court to impose a sentence of 25 years to life on count 1, and impose and stay the sentences on all other counts and enhancements. The People's sentencing memorandum requested a total sentence of 60 years to life.

At the sentencing hearing, the trial court stated it had read and considered appellant's probation report and the sentencing memoranda submitted by the parties. The court heard two victim impact statements who spoke of the devastating effect the killing of Asghedom had had on them personally and on the community.

Defense counsel reminded the trial court that appellant was 29 years old at the time of the murder, and had no criminal history other than a conviction for unlawful possession of a firearm, for which he had been placed on probation. He also presented evidence of appellant's childhood trauma and severe mental illness. The mitigation evidence included an eight-page report by Dr. Carole Lieberman, a forensic psychiatrist who had evaluated appellant over six hours, reviewed his psychiatric

16

records, and interviewed appellant's father. Defense counsel also read into the record a letter from appellant's father, addressing appellant's difficult childhood and severe mental health condition, including a diagnosis of auditory schizophrenia and the multiple unsuccessful interventions to eliminate the persistent auditory hallucinations appellant suffered. Finally, defense counsel made a statement to the court detailing appellant's childhood trauma from physical and emotional abuse, neglect, and insufficient resources to provide adequate food and basic healthcare. Counsel explained these conditions persisted throughout appellant's childhood and adolescence. Counsel described in detail appellant's severe mental health deterioration that coincided with multiple serious head injuries from car accidents and physical attacks on appellant. Counsel also detailed the numerous, but ultimately unsuccessful treatments, psychiatric interventions, and medications employed in attempting to treat appellant's "acute disorders of hearing voices, depression, hallucinations, and paranoia."

Defense counsel reiterated his request that the trial court "exercise its discretion to not impose the 25 year to life firearm enhancement" under section 12022.53, subdivision (d), but to sentence appellant to 25 years to life on count 1, impose concurrent sentences on the other counts, and not impose the firearm enhancements on those counts. Alternatively, counsel asked the court to impose a consecutive term of three years on count 3 for a maximum sentence of 28 years to life.

The People reiterated their request to sentence appellant to a term of 60 years to life, noting the high degree of cruelty, viciousness, and callousness appellant exhibited in killing Asghedom, and the devastating impact the murder had on the

17

community. Reminding the court that after Asghedom suffered 11 gunshot wounds, appellant walked over and kicked him in the head before fleeing the scene, the prosecutor declared that none of appellant's social history, including his mental health issues and other struggles in his life, "comes close to justifying what [appellant] did to a defenseless Ermias Asghedom on that Sunday afternoon."

Before imposing sentence, the court stated:

"This court is ever mindful of its responsibility to not only listen to and evaluate the mitigation presented by the defense including the letter from Dr. Lieberman which the court has considered.

"The court has also considered the position of the People. To the extent . . . the defense was asking this court to dismiss any enhancements, the court finds by clear and convincing evidence that to do so would endanger public safety. Principally the court looked at not only the one but the two guns that [appellant] used in the killing of Mr. Asghedom as well as the shooting of Mr. Lathan, and Mr. Villanueva.

"However, the sentence that the court is about to pronounce, I am very mindful of what was presented as to [appellant's] mental health history. I'm also mindful of the devastation caused to the victims and their families. So I think this sentence balances both."

The trial court then sentenced appellant to a term of 60 years to life in prison, consisting of 25 years to life on count 1, a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and a consecutive middle term of three years on count 3, plus consecutive terms of four years for the firearm enhancement (§ 12022.5) and three years

18

for the great bodily injury enhancement (§ 12022.7, subd. (a)).[3] The court recommended to the Department of Corrections and Rehabilitation that appellant "be housed in a facility that would address his mental health needs."

## B. *Applicable law*

Effective January 1, 2022, Senate Bill No. 81 added subdivision (c) to section 1385 to provide: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."[4] (§ 1385, subd. (c)(2); see *People v. Sek* (2022) 74

---

[3] In addition, the trial court imposed a concurrent term of seven years on count 5, and imposed and stayed sentence on counts 2, 4, and 6.

[4] Section 1385, subdivision (c)(2) identifies nine mitigating circumstances in subparagraphs (A) through (I):

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

19

Cal.App.5th 657, 674 [Senate Bill No. 81 "amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements . . . in the interest of justice"].) The statute specifically defines "endanger public safety" to mean "there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2); Stats. 2021, ch. 721.)

We review questions regarding the statutory interpretation of section 1385 de novo. (*People v. Walker* (2024) 16 Cal.5th 1024, 1032 (*Walker*); *John v. Superior Court* (2016) 63 Cal.4th 91, 95 [questions of statutory construction reviewed de novo].) In

---

"(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed.

"(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed.

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma.

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded."

*Walker*, our Supreme Court considered the words of the Legislature's mandate in section 1385, subdivision (c)(2), that the presence of any of the mitigating circumstances enumerated in subparagraphs (A) through (I) must be afforded "*great weight*" and " '*weighs greatly in favor of dismissing the enhancement*, unless the court finds that dismissal of the enhancement would endanger public safety.' " (*Walker*, at pp. 1034–1036.)

Our Supreme Court's examination led it to conclude "section 1385, subdivision (c)(2)'s mandate to give 'great weight' to enumerated mitigating circumstances requires a sentencing court to 'engage[ ] in a holistic balancing with *special emphasis* on the enumerated mitigating factors.' " (*Walker, supra*, 16 Cal.5th at p. 1034, quoting *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1096, review dismissed.) As the high court explained, this means that if the sentencing court "does not conclude that dismissal would endanger public safety, then mitigating circumstances strongly favor dismissing the enhancement." (*Walker*, at p. 1036.)

The presence of one or more mitigating circumstances thus does not automatically require dismissal of an enhancement. Rather, "if the court finds that dismissal of an enhancement 'would endanger public safety,' then the court need not consider the listed mitigating circumstances" under section 1385, subdivision (c)(2), subparagraphs (A) through (I). (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 296; *People v. Mazur* (2023) 97 Cal.App.5th 438, 445, review dismissed.)

Even in the absence of a finding that dismissal of an enhancement will endanger public safety, " 'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement [citation] and this 'furtherance

21

of justice' (§ 1385, subd. (c)(1)) inquiry requires a trial court's ongoing exercise of 'discretion' (*id.*, subd. (c)(2)). Thus, notwithstanding the presence of a mitigating circumstance, trial courts retain their discretion to impose an enhancement based on circumstances 'long deemed essential to the "furtherance of justice" inquiry.' " (*Walker, supra,* 16 Cal.5th at p. 1033, quoting *People v. Ortiz, supra*, 87 Cal.App.5th at pp. 1098 & 1099, rev. dism.)

We review for abuse of discretion the trial court's finding that dismissal of an enhancement would endanger public safety as well as its ultimate determination that dismissal would not be in furtherance of justice. (*People v. Mendoza, supra*, 88 Cal.App.5th at p. 298 ["we review for abuse of discretion the trial court's decision not to strike a sentence enhancement under section 1385, subdivision (a)"]; *People v. Garcia* (2024) 101 Cal.App.5th 848, 851 [superior court's finding that sentence reduction would endanger public safety reviewed for abuse of discretion].) Under that deferential standard, we will not set aside the trial court's decision unless we find it to be " 'so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 605–606.)

22

**C.** *The trial court's remarks at sentencing show that it properly understood and did not abuse its discretion in declining to dismiss the firearm enhancement under section 1385, subdivision (c)*

Appellant acknowledges the trial court was aware of its discretion to dismiss the firearm enhancement.  However, he asserts "it is not clear that the court was aware of the new statutory scheme [following Senate Bill No. 81's amendments to section 1385], the factors to be considered, and the requirement that it give great weight to the strong evidence in mitigation." Appellant argues that because the court misapprehended the relevant statutory scheme, it abused its discretion when it declined to dismiss the 25-year-to-life firearm enhancement in the face of undisputed evidence of severe mental illness and childhood trauma.  (See *People v. Lynch* (2024) 16 Cal.5th 730, 774 [" ' "[a] court which is unaware of the scope of its discretionary powers [cannot] exercise that 'informed discretion' " ' "].)  We disagree.

To prove the trial court abused its discretion by misapprehending the scope of its sentencing discretion, it is appellant's burden to "affirmatively demonstrate[ ]" such a misunderstanding.  (*People v. Coleman* (2024) 98 Cal.App.5th 709, 724; *People v. Davis* (1996) 50 Cal.App.4th 168, 172 [to prove an abuse of discretion on this basis, a defendant must "affirmatively demonstrate that the trial court misunderstood its sentencing discretion"].)  Appellant, however, points to nothing in the record to support his claim that the trial court misunderstood or failed to "exercise[ ] its discretion in accordance with the recently amended law."  And his reliance on "a silent record is

23

insufficient to meet his burden to demonstrate an abuse of discretion." (*Coleman,* at p. 725.)

Indeed, contrary to appellant's claim, the record here affirmatively shows the trial court fully understood and properly exercised its discretion when it declined to dismiss the firearm enhancement. Highlighting the evidence that appellant used not one, but two guns in his violent attack which killed Asghedom and wounded Lathan and Villanueva, the court declared its finding "by clear and convincing evidence" that dismissal of any enhancements in this case "would endanger public safety." Although this finding relieved the court of the duty to give great weight to appellant's evidence in mitigation under section 1385, subdivision (c)(2) (*People v. Mazur, supra,* 97 Cal.App.5th at p. 445), the court's remarks show that it nevertheless did place great weight on appellant's mitigating evidence. The court emphasized its responsibility to consider and evaluate the mitigation evidence presented by the defense, particularly the evidence of appellant's history of mental illness, and it indicated that the sentence it was about to pronounce balanced appellant's mitigating evidence with the devastation appellant had caused to the victims and their families. Finally, the court took appellant's mitigation evidence into account when it recommended to the Department of Corrections and Rehabilitation that appellant "be housed in a facility that would address his mental health needs."

Although the court never expressly found dismissal of the enhancement would not be in the furtherance of justice, we presume the court was aware of and complied with section 1385, subdivision (c)(1)'s mandate to "dismiss an enhancement if it is in the furtherance of justice to do so." And where, as here, "the record is silent [citation], or '[w]here the record demonstrates

24

that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' " (*People v. Carmony* (2004) 33 Cal.4th 367, 378.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

HOFFSTADT, J.